1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10    RASHELL LAVERN CLARKE,

11              Petitioner,                    No. 2:12-cv-801-MCE-EFB P

12        vs.

13    W. J. WILSON,

14              Respondent.             FINDINGS AND RECOMMENDATIONS

15    _____/

16           Petitioner is a state prisoner proceeding without counsel on a petition for a writ of habeas

17    corpus pursuant to 28 U.S.C. § 2254.  He challenges a 2009 judgment of conviction entered

18    against him in the Shasta County Superior Court on seven counts of felony child abuse, with the

19    infliction of great bodily injury as to each count, and misdemeanor obstructing a police officer.

20    He seeks relief on the grounds that: (1) the trial court violated his right to due process in

21    admitting into evidence unduly prejudicial information; (2) the trial court erred when it denied

22    his motion to suppress evidence; and (3) his trial counsel rendered ineffective assistance.  Upon

23    careful consideration of the record and the applicable law, the undersigned recommends that

24    petitioner's application for habeas corpus relief be denied.

25    /////

26    /////

                                                      1

## I.    Background[1]

A jury convicted defendant Rashell Lavern Clarke of seven counts of felony child abuse (Pen.Code, § 273a, subd. (a); undesignated statutory references that follow are to the Penal Code) and found true the allegations that defendant inflicted great bodily injury as to each count (§ 12022.7, subds.(a) & (d)).  The jury also convicted defendant of misdemeanor obstructing a police officer.  (§ 148, subd. (a)(1).)  As a consequence, the trial court sentenced defendant to a prison term of 22 years 8 months.

Defendant appeals, contending the trial court erred by (1) allowing a medical expert to testify that the children's injuries were "significant and substantial" and to state her medical diagnosis that the children suffered from child abuse, and (2) denying defendant's motion to suppress a police officer's recounting of injuries he noticed on the children found inside defendant's apartment.

We shall affirm the judgment.

### Facts and Proceedings

Defendant and his wife, Cassandra Sotelo, are the parents of seven children: D., K., Am., I., R., Af., and Aj.  D. and K. are twins and were five years old on December 8, 2008.  That day, the twins returned to kindergarten in Redding, California, after a three-week absence from school.  Their teacher noticed a very large, "fresh and . . . blistery" burn mark on D.'s arm.  Due to nearby scarring, the wound "looked like it had been repeated . . . ."  After the teacher examined D.'s arm, K. came up to show a scar on her own arm. One of the girls said that "her brothers and sisters had the same marks."  The girls' teacher immediately went to the school office, where she reported the injuries to Child and Family Services (CFS).

At the time of the report, Redding Police Department Officer Will Williams served as a school resource officer and responded to D. and K.'s school.  George Scripture arrived from CFS, and the two men spoke with D. and K.  Officer Williams asked the girls if they had an "owie," and the girls displayed the injuries on their forearms.

Defendant walked into the room where Scripture and Officer Williams were talking to the girls.  Defendant was angry and yelled very loudly that Officer Williams was a liar and had molested his children.  Defendant called the officer "a fucking

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

white devil" and "continued to talk about how [Officer Williams] had taken his kids' clothes off and molested them." Concerned for his own safety, Officer Williams called for police backup.

After asking defendant to leave the interview room approximately six times, Officer Williams finally succeeded in getting defendant into the hallway. Defendant continued to rant about Officer Williams molesting the girls and that someone had "planted information in their head." Defendant never asked about D. or K.'s welfare or whether they were hurt. Not until an additional police officer arrived, did defendant begin to calm down.

After speaking with Scripture, Officer Williams decided to remove D. and K. from the scene for their safety. Officer Williams then requested that defendant speak to him in a nearby faculty break room. Defendant stated that he could answer any questions "but he was busy and he had to get going." When the officer persisted in attempting to ask questions, defendant became angry and resumed his rant about Officer Williams being "the fucking white devil" who molested D. and K. Defendant assumed a fighting stance toward the officer. Defendant denied that D. and K. had injuries and repeated that the officer was a "fucking liar."

Officer Williams informed defendant that D. and K. were going to be taken into the custody of CFS and that the officer would need to locate defendant's other five children. Defendant responded that their mother was going to pick them up because the children "weren't going with fucking white devils . . . ." Shortly thereafter, defendant left the school.

While Officer Williams and Scripture were filling out paperwork, Sotelo came in and launched into a bizarre and profane rant in which she called the officer a liar and child molester. She also called Scripture "the devil." Sotelo left after Officer Williams threatened to arrest her.

Officer Williams asked other police officers to go to defendant's nearby apartment to check on defendant's other five children. After completing his paperwork, Officer Williams went to the apartment himself.

When Officer Williams arrived, he saw defendant and Sotelo arguing with one of the uniformed officers on the scene. Defendant called the police "fucking liars," and Sotelo threatened to call the news media. Defendant stated that his children were not in the apartment and that he only used the apartment's address to allow D. and K. to attend the nearby school. Defendant and Sotelo then departed.

The police attempted to make contact with anyone inside the apartment. The officers knocked on the door and windows, and

they loudly demanded to speak with someone inside.  No one opened the door or came to the windows.  After 20 to 30 minutes, Officer Williams decided to enter the apartment.  The police received a key from the apartment manager, but it did not open the apartment door because the locks had been changed.  Officer Williams then requested the services of a locksmith.  The officer testified that "at that point if there were – if the kids were hurt, I didn't feel like there was a reason for me to go in because the person I believed possibly could have hurt them wasn't there, so we had time.  Anybody hiding the children in the apartment couldn't get out.  We were concerned they could be hurt and if we left they'd come back and remove them, so we couldn't leave.  I felt like whoever was in there, if they were in there, were obviously hiding them for a reason to prevent their discovery, so we requested a lock Smith [ sic ]."

The locksmith arrived and opened the door.  Defendant's aunt, Nadine Bennett, was found standing at the top of the stairs.  In an upstairs bedroom, Officer Williams saw five children on the bottom bunk of a bunk bed.  One of the children was sleeping and the other four were "just frozen."

Officer Williams immediately noticed that the sleeping girl had the same sort of wound on her neck as D. and K. had on their arms.  The officer then saw that all of the children had the same types of injuries on their arms and legs.  Most of the wounds were four to six inches long and seemingly inflicted by "some sort of whipping like with a lash being done or a tool that would leave behind serious injury."  The children were taken into the custody of CFS.

On December 11 and 12, 2008, defendant's seven children were examined by Dr. Deborah Stewart, the section chief and medical director of the Child and Adolescent Abuse Resource and Evaluation Center in the Department of Pediatrics at the University of California, Davis.  Dr. Stewart's examination of the children revealed that they all suffered from numerous scars in a "classic" closed loop pattern that indicated being hit with a belt or extension cord.  The depth of the scars indicated that they were caused by the application of "tremendous force."  The wounds resulting in the scars would have been painful and bled.  The wounds were deeper than the ones Dr. Stewart regularly saw on other abused children.

K. had loop pattern scars on her right forearm, shoulder blade, right buttock, right arm, and right thigh.  The scars were deep and wide. When examined, K. was anxious, fearful, and unusually compliant. This observation caused Dr. Stewart to suspect that K. had witnessed violence against her siblings.

D. had numerous loop marks on her forearms, back, left shoulder, left buttock, right inner upper calf, and right chest.  In particular, D.'s back had "many" such scars.  D. also had a "very large" scar

4

1   from a burn on her left calf.  Although D. was polite and well
    behaved, she also was fearful and withdrawn.

2
    Four-year-old I.'s "entire back" was covered with loop marks.  She
3   also had loop and linear marks on her left inner arm, upper arm,
    right wrist, side of her chest, and right thigh.  Two of the loop
4   marks on her thigh were recent.  Dr. Stewart observed I. to be
    "extremely fearful," overly compliant during the examination, and
5   well behaved.

6   Am. (I.'s twin sister) had an old loop mark scar on her left cheek
    and a new loop mark below her eye.  These injuries stood out
7   because Dr. Stewart did not often come across children who had
    been struck in the face with belts or similar objects.
8
    Three-year-old R. suffered a "tremendous" number of scars.  (RT
9   591)  She had linear and loop marks covering her back and
    shoulders.  She also had "large numbers" of scars on her legs,
10  thighs, and buttocks.  As with the other children, Dr. Stewart
    observed R. to have been fearful and overly compliant.
11
    Two-year-old Aj. had a recent loop mark injury on his back when
12  Dr. Stewart examined him.  Aj.'s back displayed linear and loop
    shaped scars.  Aj. also had loop mark scars on his buttocks, thighs,
13  entire left arm, stomach, and across his chest.  Dr. Stewart testified
    that a child of Aj.'s age would be at risk of damaged internal
14  organs if tremendous force causing the types of scarring observed
    on the children were delivered to the stomach or belly area.
15
    Af. (Aj.'s fraternal twin) had linear and loop mark scars on her
16  shoulders, back, and buttocks.  Af. also had very long scars
    extending across her chest to her buttocks.  Dr. Stewart testified
17  that Af.'s scars "went deeply into her skin causing the same kind of
    injuries as the other children."
18
    The day after the children were taken into protective custody,
19  defendant spoke with Redding Police Department Investigator Jon
    Poletski.  During the interview, defendant admitted, "I have
20  disciplined my kids with spankings before."  Defendant further
    admitted using "a fake leather belt" to spank the children.
21  Defendant described the belt as "just a little, like a female belt"
    that belonged to the children.  He also denied hitting the children
22  with a belt in the six months prior to their being taken into
    protective custody.
23

24  ECF No. 20-1 at 3-10.

25      After the California Court of Appeal affirmed petitioner's judgment of conviction, he

26  filed a petition for review in the California Supreme Court.  Resp't's Lodg. Doc. 5.  On March

1    16, 2011, that petition was summarily denied.  Resp't's Lodg. Doc. 6.  Petitioner commenced

2    federal habeas corpus proceedings by filing a petition in this court on March 22, 2012.

3    **II.    Analysis**

4          **A.  Standards for a Writ of Habeas Corpus**

5          An application for a writ of habeas corpus by a person in custody under a judgment of a

6    state court can be granted only for violations of the Constitution or laws of the United States.  28

7    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

8    application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

9    *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.

10   2000).

11         Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

12   corpus relief:

13            An application for a writ of habeas corpus on behalf of a
         person in custody pursuant to the judgment of a State court shall
14       not be granted with respect to any claim that was adjudicated on
         the merits in State court proceedings unless the adjudication of the
15       claim -

16            (1) resulted in a decision that was contrary to, or involved
         an unreasonable application of, clearly established Federal law, as
17       determined by the Supreme Court of the United States; or

18            (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
19       State court proceeding.

20         For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

21   holdings of the United States Supreme Court at the time of the state court decision.  *Stanley v.*

22   *Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06

23   (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is

24   clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d

25   at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).

26   /////

                                          6

1    A state court decision is "contrary to" clearly established federal law if it applies a rule

2    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

3    precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003).

4    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

5    the writ if the state court identifies the correct governing legal principle from the Supreme

6    Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2]

7    *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

8    F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

9    simply because that court concludes in its independent judgment that the relevant state-court

10   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

11   application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v.*

12   *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

13   habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

14   the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

15   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

16   of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

17   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

18   condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

19   state court's ruling on the claim being presented in federal court was so lacking in justification

20   that there was an error well understood and comprehended in existing law beyond any possibility

21   for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.

22    If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

23   court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

---

24    [2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be

25   overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,

26   384 F.3d 628, 638 (9th Cir. 2004)).

527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___, U.S. ___, ___, 133 S.Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

**B. Petitioner's Claims**

**1. Admission of Evidence**

In his first ground for relief, petitioner claims that the trial court violated his right to due process in allowing Dr. Stewart to "express improper opinions and legal conclusions about the severity of the victims' injuries." ECF No. 1 at 5, 23-32. Specifically, he objects to Dr. Stewart's testimony that the children's injuries were significant and substantial and constituted child abuse. *Id.* at 23. He argues that her testimony on "the key legal issues at trial" deprived him of due process, a fair trial, and a jury trial. *Id.* He also argues that his trial counsel rendered ineffective assistance in failing to object to Dr. Stewart's testimony on federal constitutional grounds. *Id.* at 31-32.

The California Court of Appeal rejected these arguments, reasoning as follows:

> **Expert Testimony Regarding the Children's Injuries**
>
> Defendant contends the trial court erred in allowing expert testimony by Dr. Stewart regarding the severity of the victims' injuries because physical injuries and scarring are not sufficiently beyond the common experience of a lay jury. Defendant further argues that the trial court should have precluded Dr. Stewart from testifying that the children's injuries were "substantial and significant" because such a conclusion amounts to a legal conclusion rather than a medical diagnosis. Defendant also contends that Dr. Stewart should not have been allowed to testify regarding her medical diagnosis that defendant's seven children suffered from "child abuse."
>
> We reject the contentions.
>
> **A**
>
> Prior to trial, defense counsel moved to exclude any testimony by Dr. Stewart regarding whether the children suffered "serious or significant injury." The court denied the motion.

9

During trial, Dr. Stewart testified that each of defendant's children had "significant" or "substantial" injuries when she examined them.  On cross-examination, Dr. Stewart acknowledged that "significant" and "substantial" were not medically defined terms.

Over objection by the defense, Dr. Stewart also testified that "[t]hese children definitely suffered from child abuse."  This conclusion was "[b]ased on [her] physical exam, [her] experience . . . ."  As Dr. Stewart explained, "The children had injuries that were significant for the diagnosis of child physical abuse."  Dr. Stewart testified that her conclusion constituted a medical diagnosis rather than a legal conclusion:

"Q . . . . [T]here's a crime of child abuse in California, right?

"A.  [by Dr. Stewart]  Yeah.  It's a very long set of statutes, though.  You're making a real generalization.  That's why I'm asking you for some clarification.

"Q.  Right.  And the clarification is this: That statute is this long statute.  That's not the same as a medical diagnosis of child abuse, is it?

"A.  No. They don't – they don't – you guys are much more specific. You have a lot of sub clauses.

"Q.  We talked about what is legally child abuse, and your job as a medical professional is to talk about child abuse in the something nine?

"A.  International Classification of Diseases Version Nine.

"Q.  Which is, these are the things you can diagnose?

"A.  Right."

On recross-examination, defense counsel confirmed that Dr. Stewart's opinion regarding child abuse constituted a medical diagnosis.

**B**

Evidence Code section 801, subdivision (a), allows an expert witness to offer testimony "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ."

As the California Supreme Court has explained, "the decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.'  (*People v.. Kelly* (1976) 17 Cal.3d 24, 39, and cases cited.)  Second, 'the

10

admissibility of expert opinion is a question of degree.  The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard.  Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury.  It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness'" (*People v. McDonald* (1984) 37 Cal.3d 351, 367.)"  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300.)

"'Oftentimes an opinion may be received on a simple ultimate issue, even when it is the sole one, as for example where the issue is the value of an article, or the sanity of a person; because it cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be placed in.' [Citation.]"  (*People v. Valdez* (1997) 58 Cal.App.4th 494, 507.)

In an instructive case involving a charge of great bodily injury on elderly victims, the Court of Appeal held that Evidence Code section 801 "requires only that the expert be so sufficiently better informed than the juror that the opinion of the former would assist the deliberation of the latter.  Medical doctors obviously have greater knowledge than lay jurors about the gravity of most injuries, particularly as they affect elderly persons.  For this reason, medical experts have testified in the past regarding the substantiality of alleged great bodily injuries.  [Citation.]  We therefore decline to find it reversible error to admit expert medical testimony concerning the significance of the subject."  (*People v. Clay* (1984) 153 Cal.App.3d 433, 459, italics omitted .)

With these principles in mind, we consider the admissibility of Dr. Stewart's medical expert testimony.

**C**

In this case, the prosecution bore the burden of proving that defendant "under circumstances or conditions likely to produce great bodily harm or death, willfully cause[d] or permit[ed][the] child to suffer, or inflict[ed] thereon unjustifiable physical pain or mental suffering" on each of his seven children.  (§ 273a, subd. (a).)

Defendant argues that the prosecution should not have been allowed to prove its case by introducing expert testimony that the wounds sustained by defendant's children were "substantial" or "significant."  Specifically, defendant reasons that the causation

and manifestation of injuries to young children are not beyond the knowledge which may be expected of lay jurors. We disagree.

As Dr. Stewart's testimony made clear, the injuries sustained by defendant's children were unusually severe when compared to other victims of child abuse. As Dr. Stewart testified, the marks and scars were "way above the 95th percentile of marks" that she usually observed on abused children. Lay jurors can benefit from expert testimony in helping them assess the severity of wounds to young children-especially for children who received unusually severe injuries.

So too, jurors can benefit from the assistance of a medical expert when determining how injuries might have been caused. Dr. Stewart's experience was relevant and helpful in assisting the jury to evaluate defendant's claims that he used only a light child's belt in hitting them and that more than six months had elapsed between the time he last hit them and when they were taken into protective custody. A lay jury cannot be expected to understand the pathology of wounds. Thus, the trial court did not abuse its discretion in admitting the expert medical opinion of Dr. Stewart.

The trial court also did not err in allowing Dr. Stewart to express her medical diagnosis that defendant's children had suffered child abuse within the clinical definition of the term. Having reviewed thousands of cases of child abuse, Dr. Stewart had expertise in diagnosing when children had been subject to abuse. As questioning by both the prosecution and defense made clear, Dr. Stewart's opinion was not offered as a legal conclusion that the children had suffered child abuse. Instead, the jury heard repeated clarification that Dr. Stewart offered her opinion only as a medical diagnosis that did not meet the same criteria as the legal definition of child abuse. The admission of Dr. Stewart's medical opinion did not constitute error.

We also do not find error in the eliciting of testimony by Dr. Stewart that the injuries sustained by each of defendant's children were "substantial" and "significant." Dr. Stewart's testimony largely hewed to clinical definitions of trauma and injuries. Indeed, the trial court even had the witness clarify several medical terms that she employed during her testimony. To sum up the observations of wounds recounted by Dr. Stewart, she used language to describe the gravity and severity of the wounds in nontechnical words. Her description of the wounds as "substantial" and "significant" offered a lay jury means by which to comprehend the gist of her testimony about each child's injuries.

Although defendant complains that the terms "substantial" and "significant" lacked medical definition, he fails to cite any authority prohibiting an expert witness from attempting to summarize the basis for an opinion in a manner more readily

12

understandable and meaningful for the jury.  The very purpose of
Evidence Code section 801 is to provide assistance to the jury in
understanding matters subject to some measure of expertise.
(*People v. McAlpin, supra*, 53 Cal.3d at pp. 1299-1300.)  The
value of this section would be undermined if medical experts were
disallowed from providing any guidance about wounds and
pathologies that did not rely exclusively on clinical medical
definitions.  Dr. Stewart's opinion that defendant's children
suffered significant and substantial injuries was not improperly
admitted.

The trial court did not err in allowing Dr. Stewart to testify
regarding the nature and severity of the injuries suffered by
defendant's seven young children.  Based on this conclusion, we
also reject defendant's claim that he received ineffective assistance
of counsel for failure of his trial attorney to object to portions of
Dr. Stewart's testimony regarding the children's injuries.  As we
noted, in part I A, defense counsel did object to the testimony he
now challenges as inadmissible.  However, as we have explained,
the objections were nonmeritorious because Dr. Stewart's
testimony was properly admitted.  Defendant did not receive
ineffective assistance of counsel.  (*People v. Ochoa* (1998) 19
Cal.4th 353, 463 ["Representation does not become deficient for
failing to make meritless objections"].)

**D**

No more favorable result to defendant would have occurred even
in the absence of Dr. Stewart's testimony regarding her medical
diagnosis of child abuse and her opinion that the children all
suffered substantial and significant injuries.  The evidence
graphically and unambiguously showed the numerous, serious
physical injuries sustained by each of defendant's children.
Combined with defendant's admission that he had used a belt to
discipline the children, the evidence of child abuse was
overwhelming.  Even if the trial court had erred in admitting the
entirety of Dr. Stewart's testimony, such error would have been
harmless under any standard.  (*Chapman v. California* (1967) 386
U.S. 18, 24 [17 L.Ed.2d 705]; People v. Watson (1956) 46 Cal.2d
818, 836.)

ECF No. 20-1 at 10-17.

In federal court, a writ of habeas corpus will be granted for an erroneous admission of

evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the

adversary system will not be competent to uncover, recognize, and take due account of its

shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002) (quoting *Barefoot v.*

1   *Estelle*, 463 U.S. 880, 899 (1983)).  Evidence violates due process only if "there are no

2   permissible inferences the jury may draw from the evidence."  *Jammal v. Van de Kamp*, 926

3   F.2d 918, 920 (9th Cir. 1991).  Evidence must "be of such quality as necessarily prevents a fair

4   trial."  *Id.* (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463 (9th Cir. 1986)).

5           Even so, as the Ninth Circuit has observed:

6           The Supreme Court has made very few rulings regarding the
    admission of evidence as a violation of due process.  Although the

7   Court has been clear that a writ should be issued when
    constitutional errors have rendered the trial fundamentally unfair

8   (citation omitted), it has not yet made a clear ruling that admission
    of irrelevant or overtly prejudicial evidence constitutes a due

9   process violation sufficient to warrant issuance of the writ

10   *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  Therefore, "under AEDPA, even

11   clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit

12   the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as

13   laid out by the Supreme Court."  *Id.  See also Greel v. Martel*, No. 10-16847, 472 Fed. Appx.

14   503, 504, 2012 WL 907215, *1 (9th Cir. Mar. 19, 2012) ("There is likewise no clearly

15   established federal law that admitting prejudicial evidence violates due process.").

16           In light of these authorities, the state court's rejection of petitioner's claim that the trial

17   court violated his right to due process in allowing Dr. Stewart to testify that petitioner's children

18   suffered significant and substantial injuries which constituted child abuse does not support

19   habeas relief under AEDPA.  There is no "clearly established federal law" that the admission

20   into evidence of a physician's opinion about the extent of a victim's injuries violates the due

21   process clause, or that the federal constitution is violated by the admission of expert testimony

22   concerning an ultimate issue to be resolved by the trier of fact.  *Moses v. Payne*, 555 F.3d 742,

23   761 (9th Cir. 2009) (rejecting petitioner's claim that the trial court violated his right to due

24   process in allowing the opinion testimony because it improperly intruded upon the province of

25   the jury).

26   /////

1    In any event, the admission of Dr. Stewart's testimony did not render petitioner's trial

2  fundamentally unfair.  Although the testimony was damaging to the defense, it was not

3  unreliable and it was relevant to evaluate the extent of the injuries suffered by petitioner's

4  children.  Any undue prejudice was minimized when defense counsel clarified that Dr. Stewart

5  was not stating a legal conclusion but was simply expressing a medical opinion.  Under the

6  circumstances presented here, petitioner has failed to demonstrate that the decision of the

7  California Court of Appeal denying this due process claim was contrary to or an unreasonable

8  application of federal law.  Accordingly, petitioner is not entitled to federal habeas relief.

9    Nor is petitioner entitled to relief on his claim that his trial counsel rendered ineffective

10  assistance in failing to object to the admission of Dr. Stewart's testimony on federal

11  constitutional grounds.  For the reasons described above, the admission of Dr. Stewart's

12  testimony did not violate the federal constitution.  Accordingly, petitioner cannot demonstrate

13  prejudice with respect to this claim.  *See Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000)

14  (an attorney's failure to make a meritless objection or motion does not constitute ineffective

15  assistance of counsel); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a

16  futile action can never be deficient performance").

17    **2.  Motion to Suppress/Ineffective Assistance of Counsel**

18    In his next claim for relief, petitioner argues that the trial court's denial of his motion to

19  suppress Officer Williams' testimony regarding the injuries he observed on petitioner's children

20  after he entered petitioner's apartment was a violation of his federal constitutional rights.  ECF

21  No. 1 at 5, 33-45.  He argues that there were no exigent circumstances justifying the warrantless

22  entry into his home.  The California Court of Appeal denied this claim on the grounds that the

23  motion to suppress should have been brought before the commencement of trial, rather than in

24  the middle of trial, and was therefore untimely.  Petitioner argued, in the alternative, that his trial

25  counsel rendered ineffective assistance in failing to bring the motion to suppress prior to trial.

26  /////

1   The California Court of Appeal denied that claim as well, concluding that the motion to suppress

2   was not meritorious.  The court reasoned as follows:

3   **Motion to Suppress the Officer's Observation of the Children
    Inside Defendant's Apartment**

4

5   Defendant next contends the trial court erred in denying his motion
    to suppress the testimony of Officer Williams regarding the
    injuries he observed on defendant's five children after entering
6   defendant's apartment.  We reject the contention.

7   **A**

8   We begin by addressing the Attorney General's argument that
    defendant's motion to suppress was untimely.  As respondent
9   correctly points out, a motion to suppress in a felony prosecution
    must be brought before commencement of trial.  Subdivision (I) of
10  section 1538.5 provides in pertinent part: "If the property or
    evidence obtained relates to a felony offense initiated by complaint
11  and the defendant was held to answer at the preliminary hearing, or
    if the property or evidence relates to a felony offense initiated by
12  indictment, the defendant shall have the right to renew or make the
    motion at a special hearing relating to the validity of the search or
13  seizure which *shall be heard prior to trial and at least 10 court
    days after notice to the people,* unless the people are willing to
14  waive a portion of this time."  (Italics added.)

15  In this case, defense counsel did not move to suppress Officer
    Williams's testimony until midtrial.  The trial court ruled the
16  motion to be untimely.  On appeal defendant concedes as much
    when asserting that "[d]efense counsel's reasons for not filing a
17  written motion to suppress before trial pursuant to Penal Code
    section 1538.5 were not reasonable or informed tactical reasons."
18  In short, the trial court properly ruled the motion to suppress to
    have been untimely.

19

20  **B**

21  Having conceded the untimely nature of the motion to suppress,
    defendant argues that we must nonetheless reverse the judgment
22  because he received ineffective assistance of counsel.  "A
    defendant claiming ineffective assistance of counsel under the
    federal or state Constitution must show both deficient performance
23  under an objective standard of professional reasonableness and
    prejudice under a test of reasonable probability of a different
24  outcome.  [Citation.]"  (*People v. Ochoa, supra*, 19 Cal.4th at p
    414.)  As we shall explain, defendant did not receive ineffective
25  assistance of counsel because the motion to suppress was
    nonmeritorious.

26

16

The evidence at trial showed that Officer Williams entered defendant's apartment without a warrant on December 8, 2008. Defense counsel sought to dispute that the warrantless entry was "based upon the exigency and the health of the children at risk." Specifically, the defense argued that Officer Williams's willingness to await the locksmith rather than kicking in the door to the apartment dispelled any legitimate claim of exigency. Defense counsel, however, did not argue that Officer Williams's concern for the welfare of defendant's five children who were not yet taken into protective custody was a sham or a pretense for entering the apartment. As we shall explain, Officer Williams's concern for the health and safety of the children allowed him to enter the apartment under the community caretaker exception to the warrant requirement of the Fourth Amendment.

As the California Supreme Court has explained, "When performing their law enforcement responsibilities, officers are required under the Fourth Amendment to obtain a warrant before searching a house or seizing personal effects; or it must be established they acted pursuant to a recognized exception." (*People v. Ray* (1999) 21 Cal.4th 464, 467-468.) Exceptions to the warrant requirement are made for exigent circumstances and for the police acting in their capacity as community caretakers. "When the police act pursuant to the exigent circumstances exception, they are searching for evidence or perpetrators of a crime. Accordingly, in addition to showing the existence of an emergency leaving no time for a warrant, they must also possess probable cause that the premises to be searched contains such evidence or suspects. [Citations.] In contrast, the community caretaker exception is only invoked when the police are not engaged in crime-solving activities." (*Id.* at p. 471.)

The community caretaker exception recognizes that, "[i]n the average day, police officers perform a broad range of duties, from typical law enforcement activities – investigating crimes, pursuing suspected felons, issuing traffic citations – to 'community caretaking functions' – helping stranded motorists, returning lost children to anxious parents, assisting and protecting citizens in need – 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' (*Cady v. Dombrowski* (1973) 413 U.S. 433, 441 [37 L.Ed .2d 706, 714-715].)" (*People v. Ray, supra*, 21 Cal.4th at p. 467.)

"The appropriate standard under the community caretaking exception is one of reasonableness: Given the known facts, would a prudent and reasonable officer have perceived a need to act in the proper discharge of his or her community caretaking functions? Which is not to say that every open door – even in an urban environment – will justify a warrantless entry to conduct further inquiry. Rather, as in other contexts, 'in determining whether the officer acted reasonably, due weight must be given not to his

unparticularized suspicions or "hunches," but to the reasonable inferences which he is entitled to draw from the facts in the light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.' [Citation.]" (*People v. Ray, supra*, 21 Cal.4th at pp. 476-477.)

"''"The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." [Citation.] And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities. [Citations.]' (*Mincey v. Arizona* (1978) 437 U.S. 385, 392-393, [57 L.Ed.2d 290]; *Wayne v. United States* (D.C.Cir.1963) 318 F.2d 205, 212 . . . .)" (*People v. Ray, supra*, 21 Cal.4th at pp. 470-471.)

In this case, the evidence clearly established that the police entered defendant's apartment based on a reasonable concern for the health and safety of defendant's five children who had not already been taken into protective custody earlier that day. Officer Williams explained his decision to enter the apartment by testifying: "I figured with the injuries that I already had with these children that I had seen on the forearms and what had – I believe that the other children would have that same type of injury. It could happen. Plus the anger of [defendant] towards me, I would have no way to ensure their safety, so I was greatly concerned that if I didn't find where these kids were right now or as soon as possible they could be exposed to all kinds of bad things or they could be found to be okay but until I was able to determine that, I asked other officers to go to [defendant's apartment] to ensure the kids were there and safe."

The officer's concerns were legitimate and well founded. As the injuries observed on D. and K. demonstrated, at least two of defendant's children suffered similar deep scars and new wounds. D. and K.'s teacher was sufficiently alarmed by the nature of the wounds that she immediately reported the injuries to CFS. Officer Williams's observation of the same injuries confirmed their seriousness. Moreover, Officer Williams's encounters with defendant and his wife showed that they were extremely angry at the time that D. and K. were taken into protective custody. Officer Williams's concern for the remaining children was well founded and reasonable. Officer Williams was not required to secure a warrant to enter defendant's apartment in order to check on the well-being of the five children not already taken into protective custody. (*People v. Ray, supra*, 21 Cal.4th at pp. 476-477.) Having lawfully entered defendant's apartment, Officer Williams was not precluded from testifying about the injuries he noticed on each of defendant's children he located there. (*Id.*, at pp. 470-471.) The defense motion to suppress this portion of Officer Williams's testimony lacked merit. Consequently, defendant did not receive

1   ineffective assistance of counsel as a result of counsel's failure to
    bring the motion to suppress on a more timely basis.  (*People v.*
2   *Ochoa, supra*, 19 Cal.4th at p. 463.)

3   ECF No. 20-1 at 17-22.

4   ### a.  Trial Court's Denial of Motion to Suppress

5          The record reflects that, during trial, petitioner's trial counsel brought an oral motion to

6   suppress the testimony of Officer Williams.  Reporter's Transcript on Appeal (RT) at 465.  The

7   trial court denied the motion, ruling that it was "untimely."  *Id.* at 466-67.  Later, however, the

8   trial court revisited the issue and decided to hold a hearing on the motion to suppress.  *Id.* at 493.

9   After hearing argument from counsel, and taking into consideration the testimony previously

10  entered into evidence at trial, the trial judge denied the motion on the grounds that "the entry and

11  search and observation of the children was the product of the officer's appropriate concern for

12  the whereabouts and welfare of the children."  *Id.* at 495.  In his second claim for relief,

13  petitioner argues that the trial court's ruling on his motion to suppress violated his right "to a fair

14  trial."  ECF No. 1 at 5.

15         The United States Supreme Court has held that "where the State has provided an

16  opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be

17  granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional

18  search or seizure was introduced at his trial."  *Stone v. Powell*, 428 U.S. 465, 494 (1976).  There

19  is no evidence before the court that petitioner did not have a full and fair opportunity to litigate

20  his Fourth Amendment claims in state court.  On the contrary, after initially denying the motion

21  on procedural grounds, the trial judge changed his mind and held a hearing on the merits of the

22  motion.  Because petitioner had a fair opportunity to and did, in fact, litigate his Fourth

23  Amendment claims in state court, his second claim for relief is barred in this federal habeas

24  proceeding.  *Stone*, 428 U.S. at 494.

25  /////

26  /////

1    Furthermore, even if not barred the claim lacks merit for the reasons cited by the state

2    court.  The record contains evidence showing clear and adequate grounds for the officer's urgent

3    concern for the whereabouts and welfare of the children.

4    **b.  Ineffective Assistance of Trial Counsel**

5    Petitioner's final claim is that his trial counsel rendered ineffective assistance in "failing

6    to bring a written motion to suppress before trial."  ECF No. 1 at 6, 33-34.  He faults trial

7    counsel for failing to conduct sufficient research prior to trial to determine whether a motion to

8    suppress was feasible.  *Id.* at 41.  He also faults counsel for failing to "provide the court with a

9    more detailed argument with case citations that would have justified granting the motion to

10   suppress."  *Id.* at 42.  Petitioner again premises his claim on the argument that Officer Williams

11   improperly entered his apartment without a warrant because there were no exigent circumstances

12   existing at that time which justified a warrantless search.  *Id.* at 33-45.  Respondent counters that

13   the search conducted by Officer Williams was justified by either the "emergency aid" or

14   "community caretaker" exceptions to the Fourth Amendment.  ECF No. 20 at 25-28.

15   To support a claim of ineffective assistance of counsel, a petitioner must first show that,

16   considering all the circumstances, counsel's performance fell below an objective standard of

17   reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  After a petitioner

18   identifies the acts or omissions that are alleged not to have been the result of reasonable

19   professional judgment, the court must determine whether, in light of all the circumstances, the

20   identified acts or omissions were outside the wide range of professionally competent assistance.

21   *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  "Counsel's errors must be 'so serious as

22   to deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Richter*, 131 S.Ct. at 787-

23   88. (quoting *Strickland*, 466 U.S. at 687).  Surmounting the bar imposed by *Strickland* was

24   "never an easy task," and "establishing that a state court's application of *Strickland* was

25   unreasonable under § 2254(d) is all the more difficult."  *Id.* at 788.

26   /////

20

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S.Ct. at 792. *See also Gulbrandson v. Ryan*, 711 F.3d 1026, 1037 (9th Cir. 2013).

It is clearly established federal law that the failure of trial counsel to file a motion to suppress may support a claim of ineffective assistance of counsel. *Kimmelman*, 477 U.S. at 383; *Moore v. Czerniak*, 574 F.3d 1092, 1101 -1102 (9th Cir. 2009). In order to prevail on the deficient performance prong of *Strickland*, a petitioner must demonstrate that his counsel's failure to file such a motion "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. In order to demonstrate prejudice, a petitioner must demonstrate that: (1) the motion is meritorious, and (2) the verdict would have been different absent the excludable evidence. *Kimmelman*, 477 U.S. at 375; *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Kimmelman*, 477 U.S. at 373-74) (so stating with respect to failure to file a motion to suppress on Fourth Amendment grounds)). *See also Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (Trial counsel is not ineffective in failing to file a suppression motion "which would have been 'meritless on the facts and the law[.]'"); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (failure to file suppression motion is not ineffective assistance where counsel investigated filing the motion and there was no reasonable possibility that the evidence would have been suppressed); *United States v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991) (Counsel did not render ineffective assistance by failing to file a motion to suppress that was "clearly lacking in merit[.]"). As noted above, an attorney's failure to make a meritless objection or motion does not constitute ineffective assistance of counsel. *Jones*, 231 F.3d at 1239 n.8 (citing *Boag*, 769 F.2d at 1344).

> The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject to a few specifically established and well-delineated exceptions."

*Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  The "emergency doctrine" or "community caretaker exception" is "a very limited and specific exception to the requirement that a search warrant be obtained before searching a private residence."  *United States v. Russell*, 436 F.3d 1086, 1093-94 (9th Cir. 2006) (Thomas, J., concurring in part and dissenting in part).  The exception permits a warrantless search of a residence when officers "reasonably believe that a person within is in need of immediate aid."  *Mincey*, 437 U.S. at 392.  "The emergency doctrine is based on and justified by the fact that, in addition to their role as criminal investigators and law enforcers, the police also function as community caretakers."  *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005); *see also United States v. Bradley*, 321 F.3d 1212, 1214 (9th Cir. 2003) ("the emergency doctrine is derived from police officers' community caretaking function").  To justify application of the emergency doctrine, three circumstances must exist:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Stafford*, 416 F.3d at 1073-74) (quoting *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000)).

As respondent points out, another exception to the general rule requiring a warrant prior to a search of a residence is the "need to assist persons who are seriously injured or threatened with such injury."  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  Under this exception, "law enforcement officers 'may enter a home without a warrant to render emergency assistance to an

22

injured occupant or to protect an occupant from imminent injury.'" *Michigan v. Fisher*, 558 U.S.

45, 47 (2009) (quoting *Brigham City*, 547 U.S. at 403).  This exception "does not depend on the

officers' subjective intent or the seriousness of any crime they are investigating when the

emergency arises," but requires only "an objectively reasonable basis for believing . . . that a

person within [the house] is in need of immediate aid." *Id.* (internal citations omitted).  Under

this doctrine, the government must show that: "(1) considering the totality of the circumstances,

law enforcement had an objectively reasonable basis for concluding that there was an immediate

need to protect others or themselves from serious harm; and (2) the search's scope and manner

were reasonable to meet the need." *United States v. Reyes-Bosque*, 596 F.3d 1017, 1029 (9th

Cir. 2010) (quoting *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008) and citing *Brigham

City*, 547 U.S. at 404–06).  *See also United States v. Bradley*, 321 F.3d 1212 (9th Cir. 2003)

(officers reasonably entered defendant's home to see if nine year old child was "in a house in the

middle of the night without the supervision of any responsible adult"); *Wolf v. City of Stockton*,

441 Fed. Appx. 481, 482 (9th Cir.  2011) ("Given the concerns of Nicholas's father, the unusual

living conditions inside the van, and Wolf's uncooperative and disruptive behavior, the officers

had reasonable grounds to believe that Nicholas was residing in a situation unsafe for a young

child, and thus that a potential emergency situation required further investigation").  In

evaluating all exceptions to the Fourth Amendment, "the ultimate touchstone . . . is

reasonableness." *Fisher*, 558 U.S. at 47 (internal citations omitted).

As set forth above, the California Court of Appeal denied petitioner's claim that his trial

counsel rendered ineffective assistance in failing to file a timely motion to suppress, reasoning

that any such motion lacked merit because Officer Williams was justified in entering petitioner's

apartment under the "community caretaker exception."  ECF No. 20-1 at 20-21.  That decision is

not contrary to or an unreasonable application of federal law and should not be set aside.  Officer

Williams clearly had a reasonable basis to enter petitioner's apartment to investigate the well-

being of petitioner's other children, who may have been injured or in the house by themselves.

1   The circumstances of this case, including the injuries observed on petitioner's school-aged

2   children, the bizarre behavior exhibited by petitioner and his wife, and the fact that the

3   manager's key could not open the apartment door, both objectively and subjectively easily led

4   the officer to believe that one or more children might be in need of immediate aid.  It is plain

5   from the record that Officer Williams acted out of a reasonable and genuine concern for the

6   welfare of any child who may have been in the apartment.

7       Petitioner has also failed to demonstrate that "the verdict would have been different

8   absent the excludable evidence." *Kimmelman*, 477 U.S. at 375.  Dr. Stewart testified in

9   significantly more detail than Officer Williams about the injuries to all of petitioner's children.

10  Accordingly, even absent Officer's Williams' testimony, the jury would have heard evidence

11  about the condition of the children.  In light of this evidence, petitioner has failed to show

12  prejudice resulting from trial counsel's failure to file a motion to suppress prior to the trial.[3]

13  **III.  Conclusion**

14      For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

15  application for a writ of habeas corpus be denied.

16      These findings and recommendations are submitted to the United States District Judge

17  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

18  after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties.  Such a document should be captioned

20

21  [3]  Petitioner has also failed to demonstrate deficient performance with respect to this
    claim.  Petitioner's trial counsel explained to the trial court that he did not file the motion to

22  suppress earlier because he believed, based on Officer Williams' police report, that Williams
    was justified in entering petitioner's apartment in order to ascertain whether the other children

23  were in danger.  RT at 464-65.  It was not until Officer Williams testified at trial that he did not
    kick down petitioner's door because "there was no hurry" and he "had time" that counsel

24  decided to make an oral motion to suppress his testimony on the grounds that there was no
    exigency.  *Id.* at 465.  Counsel's performance with respect to the motion to suppress is not

25  unreasonable based on the facts known to counsel at the time and was certainly not "outside the
    wide range of professionally competent assistance.  *Strickland*, 466 U.S. at 690.  *See also*

26  *Gulbrandson*, 711 F.3d at 1037 (reviewing courts must give counsel "the benefit of the doubt"
    and evaluate counsel's conduct from his perspective at the time).

"Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  August 5, 2013.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE